UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| CYNTHIA CARPENTER-BARKER, as next friend of MEGAN CARPENTER, | Case No. 1:15-cv-41 |
| | Judge Timothy S. Black |
| Plaintiff, | |
| vs. | |
| OHIO DEPARTMENT OF MEDICAID, *et al.*, | |
| Defendants. | |

**ORDER RESOLVING CROSS MOTIONS
FOR SUMMARY JUDGMENT (Docs. 50, 52)**

This civil action is before the Court regarding the parties' cross motions for summary judgment (Docs. 50, 52) and their supporting memoranda (Docs. 53, 56, 57, 58, 60, 61).

## I. BACKGROUND

### A. Factual Background

Plaintiff Cynthia Carpenter-Barker brings this action on behalf of her daughter, Megan Carpenter. Megan is a woman in her early thirties who suffers from multiple disabling medical impairments. Her condition is medically complex, with her diagnoses including, among others: encephalopathy NOS; general convulsive with intractable epilepsy; autism; profound mental retardation; cognitive impairment; hypothyroidism NOS; generalized muscle weakness; profound sensorineural hearing loss (deafness); ataxia; and sub-cortical myoclonus. (Doc. 6-1, at 2). Megan has impaired mobility, self-

1

injurious behaviors, outbursts and aggression, and is unable to perform activities of daily living for herself. *Id.* Megan also suffers from seizures that require treatment with medication administered directly after a seizure (although the parties disagree on the frequency and severity of these seizures). *Id.*

Megan lives with her mother and receives in-home nursing care seven days per week. Megan is enrolled in the Individual Options ("I/O") home and community-based services waiver program through the Ohio Department of Medicaid ("ODM"), through which she receives homemaker/personal care services. (Doc. 1-2, at 2). The Butler County Board of Developmental Disabilities administers Megan's I/O waiver. *Id.* Megan is also enrolled in Medicaid's State Plan ("State Plan") and receives 128 hours per week of private duty nursing ("PDN") services through the State Plan. *Id.*

The central dispute in this case revolves around the number of PDN hours Megan is afforded by the State Plan. Defendants' motion provides a helpful, neutral factual background on the nature of PDN:

> PDN is a continuous nursing service that requires the skills of, and is performed by, a nurse for four to twelve hours at a time (subject to certain exceptions not relevant here). Ohio Admin. Code 5160-12-02(A). PDN is provided in a person's home, unless it is medically necessary for a nurse to accompany the person in the community. Ohio Admin. Code 5160-12-02(B). For individuals who are, like Megan, enrolled in a waiver program administered by the Department of Developmental Disabilities, ODM will authorize Medicaid coverage only after a "prior authorization" request is submitted and ODM determines, among other things, that the requested services are medically necessary. *See* Ohio Admin. Code 5160-12-02.3(C). Medical-necessity determinations are individualized, fact-based determinations. At all times relevant to this case, a service was medically necessary if it was necessary for the diagnosis or treatment of disease, illness, or injury and without which the patient could be expected to suffer prolonged, increased or new morbidity, impairment of function,

2

dysfunction of a body organ or part, or significant pain and discomfort. Ohio Admin. Code 5160-1-01(A) (2014). A medically-necessary service also had to:

> 1) Meet generally accepted standards of medical practice;
>
> 2) Be appropriate to the illness or injury for which it is performed as to type of service and expected outcome;
>
> 3) Be appropriate to the intensity of service and level of setting;
>
> 4) Provide unique, essential, and appropriate information when used for diagnostic purposes;
>
> 5) Be the lowest cost alternative that effectively addresses and treats the medical problem; and
>
> 6) Meet certain general principles regarding reimbursement for Medicaid-covered services.

Ohio Admin. Code 5160-1-01(A)(1) – (6) (2014).

If ODM determines that requested PDN hours are medically necessary and meet other prior-authorization criteria, the Medicaid program will pay for up to the number of PDN hours approved, for a limited time period (for example, 30 PDN hours per week, for one year). *See* Ohio Admin. Code 5160-12-02.3(C)(2)(a). PDN may not be authorized for more than one year at a time. Ohio Admin. Code 5160-12-02.3(C) ("The period for which PDN authorization applies shall not exceed three hundred sixty-five days."). If an individual wants PDN to continue past the end of a given prior-authorization period, she (or her provider) must submit another prior-authorization request. If ODM does not completely grant an individual's request for prior authorization of PDN, the individual is entitled to an administrative hearing called a "state hearing." Ohio Admin. Code 5160-12-02.3(C)(2)(b); 5101:6-3-01(B)(6). If unsatisfied with the outcome of a state hearing, an individual may ask ODM to internally review the decision by requesting an "administrative appeal." Ohio Admin. Code 5101:6-8-01(A). An individual may appeal the outcome of an administrative appeal to common pleas court pursuant to Ohio Rev. Code §§119.12 and 5101.35.

(Doc. 52, at 7–9).

Pursuant to the process outlined above, ODM has reviewed the PDN hours authorized for Megan annually for several years. For the last decade, Defendants have consistently attempted to reduce the number of PDN hours authorized for Megan after each evaluation, arguing that ODM's evaluations of Megan demonstrate that Megan's condition can be managed adequately with reduced PDN time. Plaintiff has consistently fought against any PDN reduction using the administrative appellate system authorized by statute. (*See* Doc. 50, 13–16). Although Megan had been authorized 168 hours of PDN per week in 2008, she has lived with 128 hours since 2010. (*Id.* at 13). Plaintiff has thwarted ODM's annual attempts to reduce Megan's PDN hours each year since then, either through winning her cases on appeal or through negotiated settlements. (*See id.* at 13–15).

In December 2014, despite having reached, only four months previously, a settlement agreement with Plaintiff to continue Megan's PDN at 128 hours per week, ODM again issued notice to Plaintiff that it proposed to reduce Megan's PDN hours from 128 hours per week to 56 hours per week. (Doc. 21, at 11). This notice spurred Plaintiff to file the present suit.

### B. Plaintiff's Claims

Plaintiff's amended complaint raised the following claims against Defendants:

1) A claim alleging that Defendants' frequent and continued proposals to reduce Megan Carpenter's PDN hours, most recently in 2014, amount to a failure to provide procedural due process in violation of 42 U.S.C. § 1396a.

2)  A claim that Defendants' efforts to reduce Megan Carpenter's PDN hours violate the "integration mandate" of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132.

3)  A claim that Defendants' efforts to reduce Megan Carpenter's PDN hours violate the "integration mandate" of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*

(*Id.* at 14–19). On December 12, 2015, the parties filed a "joint stipulation regarding scope of Plaintiff's request for relief and Defendants' fundamental alteration affirmative defense" that purported to clarify the exact relief Plaintiff seeks through this civil action. (Doc. 36, at 31–34). That document identifies the following as Plaintiff's claims for relief:

1)  Ms. Carpenter requests that the Court assume jurisdiction over this matter.

2)  Ms. Carpenter seeks through this lawsuit a declaration from the Court that Defendants' actions in proposing to reduce the number of hours of PDN services authorized for Ms. Carpenter through the State Medicaid plan in 2014 places her at risk of institutionalization in violation of the ADA and Section 504.

3)  Additionally, Ms. Carpenter seeks an order from the Court requiring Defendants to reimburse the cost of providing Ms. Carpenter with the amount of nursing services she needs to prevent institutionalization or a risk of institutionalization. Ms. Carpenter intends to present evidence that she needs a total of 24 hours per day, 7 days per week of nursing services provided by a registered nurse or a licensed practical nurse under the direction of a registered nurse.

4)  Further, Ms. Carpenter seeks an order from the Court requiring Defendants to refrain from attempting to reduce the number of hours of nursing services authorized for Ms. Carpenter unless or until Ms. Carpenter's treating physician determines that her medical conditions have improved such that her need for nursing services is reduced, and her treating physician has recommended a reduction in nursing services.

5

5) Ms. Carpenter seeks a declaration from the Court that Defendants did not provide Ms. Carpenter adequate notice regarding the 2014 reduction of her PDN hours in violation of her procedural due process rights under Section 1983.

6) Ms. Carpenter seeks an order from the Court that Defendants provide all future notices to Ms. Carpenter or her representative regarding a proposed reduction in authorization of services in writing and in compliance with the due process requirements set forth in 42 U.S.C. § 1396a(a)(3), 42 C.F.R. § 435.919, and 42 C.F.R. § 431.206 through 42 C.F.R. § 431.250.

7) Finally, Ms. Carpenter also seeks an order from the Court that she is the prevailing party in this action and an award of attorneys' fees and costs.

8) Ms. Carpenter does not seek relief for any other individuals through this action.

9) Ms. Carpenter does not intend to seek any relief other than that identified above.

(*Id.* at 32–33).

### C. Procedural History

Plaintiff filed the complaint in this case on January 20, 2015. (Doc. 1). On January 26, 2015, Plaintiff filed a motion for preliminary injunction requesting that Defendants be enjoined from reducing Megan's PDN hours pending the outcome of the action. (Doc. 6). To the parties' credit, an agreement was reached wherein Defendants would not reduce Megan's PDN hours while this action was ongoing, and the Court accordingly entered an Order staying the motion for preliminary injunction. (Doc. 20).

Defendant then filed a motion for judgment on the pleadings on December 12, 2015. (Doc. 36). That motion argued that claim preclusion prevented Plaintiff from

pursuing any of her claims, as the voluntary dismissal of her 2015 hearing in state court constituted a binding decision. (*Id.* at 6). This Court rejected that argument, but held that Plaintiff's due process claim was mooted, as the time period implicated in Defendants' 2014 notice that Megan's PDN hours would be reduced had expired. (Doc. 48, at 7–9). Accordingly, Plaintiff's only surviving claims are the closely related claims citing the "integration mandate" present in both the ADA and the Rehabilitation Act. (*See* Part III.A, *infra*).

This case has been active on the Court's docket for nearly three years, and as stated above, the time period implicated in ODM's late 2014 decision to reduce Megan's PDN hours has expired. Although the parties in this action agreed to maintain the status quo regarding Megan's PDN hours until this litigation had concluded, ODM's annual review process of Megan's PDN needs and Plaintiff's subsequent appeals of ODM's decisions has continued. Accordingly, ODM again recommended in late 2015 that Megan's weekly PDN hours be reduced from 128 to 56. Plaintiff contested that decision, and following a hearing on March 10, 2016, a state hearing examiner found that ODM's denial of Megan's request for 128 weekly PDN hours was "incorrect." (Doc. 51, at 26). The examiner's written decision found that ODM had not provided sufficient evidence that certified non-nurse aides or caregivers were prepared to monitor Megan for seizures and administer her medication in the event of a seizure. (*Id.* at 28). The Court is unaware of the status of any state hearings or ODM determinations since March 2016.

Both parties have filed motions for summary judgment on Plaintiff's two remaining claims. (Docs. 50, 52). Those motions are now ripe for review.

7

## II. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## III. ANALYSIS

### A. Plaintiff's ADA and Rehabilitation Act claims are without merit.

Plaintiff's motion for summary judgment claims that "Defendants, as a public entity receiving federal funds, have discriminated against [Plaintiff], a qualified individual with a disability, in violation of federal law by unlawfully precluding her from services Defendants offer based on her disability." (Doc. 50, at 22). Specifically, Plaintiff claims that Defendants' efforts to reduce Plaintiff's PDN hours violate Title II of the ADA and Section 504 of the Rehabilitation Act.

Although two separate statutes are cited, they provide support for what is essentially one claim. Plaintiff claims that, by reducing Plaintiff's PDN hours below 128 hours per week, Defendants are taking action that will necessarily mandate Plaintiff's removal from her home and require her institutionalization. (*Id.* at 21).

Title II of the ADA regulations provide that public entities are to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). A program or activity means "all the operations of" the entity of a state, "department, agency, or other instrumentality of a State or local government" distributing such assistance, as well as each "department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government." 29 U.S.C. § 794(b)(1) and (2). "The most integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. § Pt. 35, App. B. Similarly, Section 504 of the Rehabilitation Act provides, "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794(a). Plaintiff's claim is essentially that, by taking action that will result in Megan's institutionalization, Defendants are discriminating against Megan on the basis of her disability and violating the above-

9

quoted "integration mandates" found in the ADA and the Rehabilitation Act.[1]

Plaintiff's claim is heavily reliant upon the Supreme Court's decision in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999). In *Olmstead*, two mentally retarded plaintiffs who were voluntarily admitted to Georgia institutions sued when they remained institutionalized long after their treating medical professionals determined that they could be treated appropriately in a community-based setting. *Id.* at 594. The Court ultimately determined that

> under Title II of the ADA, States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

*Id.* at 607.

Plaintiff argues that Defendant's decision to reduce Megan's PDN hours will necessarily result in her institutionalization, and that her remaining at home under 128 hours per week of nursing care is reasonable. Defendants disagree with both of these assertions, arguing that, based on the independent review of the ODM, Megan's condition does not require 128 weekly hours of PDN. Defendants have for years maintained that Megan's conditions can be properly managed with reduced PDN time and that any on site treatment for Megan's seizures can be administered by trained homemaker/personal care aides provided through Megan's I/O waiver as opposed to nurses. (*See* Doc. 52-5).

---

[1] Neither party disputes that the Ohio Department of Medicaid is a "public entity" as conceived by these statutes or that Megan has a qualifying disability to be protected by these statutes.

Plaintiff cites several cases applying *Olmstead* for the proposition that "the risk of institutionalization can support a valid claim under the ADA's integration mandate." (*See, e.g.*, Doc. 56, *et passim* (citing *Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013); *M.R. v. Dreyfus*, 697 F.3d 706 (9th Cir. 2012); *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599 (7th Cir. 2004); *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175 (10th Cir. 2003); *Townshead v. Quasim*, 328 F.3d 511 (9th Cir. 2003)). However, each of these cases is distinguishable from the present case. The cases cited by Plaintiff all involve agency decisions to reduce or limit benefits to certain classes of individuals based on a categorical distinction, while the present case involves a decision to reduce benefits based on a highly detailed *individual* examination. In *Pashby*, 13 disabled plaintiffs sued after the North Carolina general assembly voted to impose stricter eligibility requirements across the board for in-home personal care services awarded through Medicaid. *Pashby*, 709 F.3d at 313. In *M.R. v. Dreyfus*, Washington state implemented an order that reduced the base monthly allotment of in-home care hours to *all* disabled care recipients for budgetary reasons. *M.R. v. Dreyfus*, 697 F.3d 706 at 723–24. In *Radaszewski*, the plaintiff challenged an Illinois Medicaid policy that awarded PDN to individuals under the age of 21 but imposed additional restrictions on individuals over the age of 21 that would have required Plaintiff to become institutionalized when he aged out of the more generous youth program. *Radaszewski*, 383 F.3d 599, 602–03. In *Fisher*, Plaintiffs challenged Oklahoma's decision to impose a blanket cap limiting covered prescription medications for individuals in the home and community-based services program to five per month. *Fisher*, 335 F.3d at 1177–78. In *Townshead*, Plaintiffs challenged the fact

11

that Washington State's community based services Medicaid program gave differing levels of support otherwise similarly situated individuals based on their income level (distinguishing between the "medically needy" and the "categorically needy"). *Townshead*, 328 F.3d at 513–14.

In contrast to each of the cases cited above, the hundreds of pages of evidence submitted with the parties' dispositive motions clearly demonstrate that ODM's decision to reduce Megan's PDN hours was a decision based on careful analysis of Megan's specific case, and not premised on the type of disability Megan suffers or based on Megan's membership in any category or class. Prior to ODM's attempt to reduce Megan's PDN hours in 2014 that prompted this case, an ODM nurse reviewed a broad array of documents regarding Megan's care and needs, including Megan's plan of care, Megan's Individual Support Plan, Megan's Day Program Summary, the Butler County Board of Developmental Disabilities' Comprehensive Level of Care Assessment, the Butler County Board of Developmental Disabilities' Health Record Review, forms that purport to document Megan's seizure activity, and forms that purport to document medications administered to Megan. (*See* Doc. 52-1, at 5–6, 11–212). Also, two ODM nurses visited Megan in her home, and at least one ODM nurse assessed Megan using a PDN acuity tool and a PDN assessment tool, talked to Megan's only nurse, Gayle Windhorst, and talked to Plaintiff regarding Megan's condition. (*See id.*). ODM's determination that Megan should receive fewer weekly PDN hours affects no other disabled individual's care.

The only evidence submitted by Plaintiff that would suggest that ODM's determination regarding Megan's PDN hours was categorically based, rather than based on Megan's unique circumstances, is a quote from Dr. Mary Applegate, ODM's Medical Director, at the March 10, 2016 state hearing to review ODM's December 22, 2015 decision denying Plaintiff's PDN request. Dr. Applegate was questioned by Paul Disantis, Plaintiff's representative at the hearing, regarding her opinion of the plan of care established by Megan's treating physician:

> Q: Are you aware that, in the plan of care completed by Dr. Fran [sic], he does require PRN—or private-duty nursing at all times from seizure activities—I'm sorry—pharmalogical care, observation, treatment, monitoring and evaluation?
>
> A: I—I did read that in the plan of care. I've also read hundreds of plans of care for kids with seizures, and he is the only one in the entire state who has written this for patients who have seizures and who are neurologically devastated; so I do not consider that to be the standard of care in the state.
>
> Q: What about all the other—so the other conditions from which she suffers don't contribute in any way?
>
> A: Sadly, we have thousands of patients in the waiver program who have neurologic devastation; and no other physician has written orders quite like this. *So the only patients who require private-duty nursing like this are patients who have burns, ventilators and really require that level of skilled nursing care on that continuous basis.* So—so that's the reason we arrived at the conclusion that we did.

(Doc. 51, at 111–12 (emphasis added)). Plaintiff argues that Dr. Applegate's statements demonstrate that ODM will only award significant PDN hours to patients with burns and patients on ventilators and that patients such as Megan who suffer from seizures and other neurological disorders would never be approved for PDN at the level Megan

13

requires, regardless of the circumstances of any individual patient. (Doc. 50, at 21).

However, taken in context with Dr. Applegate's testimony at that hearing, and at previous hearings concerning Megan, it is clear beyond a dispute of material fact that Dr. Applegate did not claim that ODM policy was to bar access to any specific amount of PDN hours based upon the category of disability suffered by a claimant. Dr. Applegate's statement emphasized above is read by this Court to indicate that the only patients who need PDN are patients who require skilled nursing care on a continuous basis, and that burn victims and patients on ventilators are two examples of patients who, unlike Megan, need that level of care. This reading is reinforced by a Dr. Applegate's statements during an administrative hearing regarding Megan's allotted PDN hours held on January 27, 2015:

> MS. OSSECK[2]: . . . Dr. Applegate, you talked about some of the other patients receiving private duty nursing. Those are patients that are on ventilators and that kind of thing?
>
> DR. APPLEGATE: Yes. I was trying to give an example of what continuous skilled nursing services mean in terms of medical necessity.
>
> MS. OSSECK: Right. So in private duty nursing, it must be medically necessary. Right? We can agree on that?
>
> DR. APPLEGATE: Yes.
>
> * * *
>
> MS. OSSECK: It doesn't identify by, you know, that person must be receiving – must be on a ventilator, right?

---

[2] Ms. Osseck was one of Megan's attorneys at this point in the litigation. (Doc. 57-1, at 7).

> DR. APPLEGATE: No. I don't want to be misunderstood. I was simply giving an example. *I wasn't testifying that only patients on ventilators can receive private duty nursing*.

(Doc. 57-1, at 114–15 (emphasis added)). These additional comments from Dr. Applegate clearly demonstrate the non-exclusive nature of her later statement that patients on ventilators and patients with burns are examples of those who need PDN services.

Because ODM's determinations regarding Megan's need for PDN hours have been tailored to her particular circumstances based on analysis of her unique condition and medical history, Plaintiff's ADA and Rehabilitation Act claims must be dismissed. Plaintiff claims that "the ODM denied [Megan] round-the-clock PDN services because she doesn't have the 'right kind' of disability" (Doc. 60, at 19), but evidence has not been provided that would allow a reasonable juror to conclude that ODM would never grant 128 hours of PDN per week to an individual with a disability similar to Megan's but whose individual circumstances demonstrated to ODM a greater need for PDN. In other words, ODM has not determined that individuals with seizures should not receive 128 weekly hours of PDN—it has merely determined that *Megan* should not. Therefore, even assuming that ODM's decision regarding the level of care required by Megan was incorrect, the antidiscrimination protections of the statutes cited by Plaintiff are inapplicable here.

Accordingly, Plaintiff's claims regarding the ADA and the Rehabilitation Act are dismissed.

**B. Arguments regarding the methodology and validity of Defendant's individualized assessment of Megan's disability are not relevant to the remaining claims in this case.**

A significant portion of both motions for summary judgment and their responsive memoranda is dedicated to arguments regarding the accuracy and validity of the process through which Defendant determined that Megan's PDN hours should be reduced. Plaintiff has raised the following arguments in opposition to ODM's determination regarding PDN hours:

1) Defendants improperly came to a conclusion disputed by Megan's treating physician, Dr. David Neal Franz. (Doc. 50, at 26–29).

2) Defendant's plan to replace services provided by registered nurses with services provided by trained but unlicensed aides violates Ohio law. (*Id.* at 29–33).

3) The PDN "acuity scale" used by Defendant to objectively determine Megan's need for PDN hours was arbitrary and was improperly used without the necessary approval of the Ohio General Assembly's Joint Committee on Agency Rule Review as required by state law. (*Id.* at 34–37 (citing O.R.C. § 119.03)).

4) ODM is trying to compel Plaintiff to serve as a "natural support" for Megan to make up for reduced PDN hours, which is prohibited by statute. (*Id.* at 42).

In response, Defendant has raised the following arguments supporting its attempts to reduce Megan's PDN hours:

1) Megan's reported frequency and severity of seizures at home, as well as the number of PDN hours she actually uses, has long been exaggerated by the improper, inaccurate, and at times forged documentation of Megan's only assigned nurse, Gayle Windhorst, who was recently required to return $344,366.54 to ODM because she was found to have inappropriately billed ODM for services related to Megan's care. (Doc. 57, at 8–12).

16

2) Records from The Lodge Activity Center, an adult daycare program where Megan spends 40 hours a week, support Defendant's assertion that Megan's seizure activity is not as extreme as stated by Plaintiff. (*Id.* at 13–14).

3) The medicine prescribed for immediate use during Megan's seizures, as well as its oral method of distribution, demonstrate that Megan's seizures are not as severe as is being claimed. (*Id.* at 15–16).

4) ODM's determination regarding Megan's need for PDN hours was based on observation from trained medical professionals and a thorough review of all Megan's relevant medical records. (*Id.* at 27).

5) Megan's treating physician, Dr. Franz, is the only doctor in the state of Ohio who orders around-the-clock nursing for individuals like Megan with intermittent seizures, and his professional opinion was therefore properly found by ODM to exceed Megan's actual needs. (*Id.* at 7).

These arguments attacking and defending the merits of Defendant's decisions regarding PDN hours, which have been consistently made through the years during the appeals process provided for ODM determinations, have no bearing on the claims that remain viable in the case before this Court. As discussed in detail above, the only remaining claims from Plaintiff's complaint accuse Defendant of discrimination against Megan on the basis of her disability in violation of the "integration mandates" of the ADA and the Rehabilitation Act. (*See supra* Part III.A ). The antidiscrimination protections of the ADA and the Rehabilitation Act are not appropriately used to attack a state's individualized assessment of a person's medical needs when there is a disagreement as to the validity of that determination. Plaintiff is more than familiar with the proper venue for disputing the validity of ODM's determinations regarding PDN hours, as she has successfully used that venue for years to prevent the reduction of Megan's care (and has continued to do so even while this case was pending). To the

extent that Plaintiff's assertions regarding the flaws in ODM's determination regarding Megan's PDN hours are allegations of a lack of procedural due process, that claim, which per Plaintiff's earlier stipulation was limited only to the circumstances surrounding ODM's 2014 determination (*see* Doc. 36, at 31–34), was previously dismissed by this Court as moot. (*See* Doc. 38, at 7–9).

    **C.**    **All requests for injunctive relief impacting Defendants' future decisions regarding PDN hours are mooted by a recent change in Ohio law.**

Finally, even were the Court able to order ODM to refrain from evaluating Megan's PDN hours in the future, any such order is now moot due to recent changes in Ohio law. Ohio's state prior-authorization rule, which previously granted ODM the authority to review any request for prior authorization of PDN services, has been amended to remove ODM's authority. *See* Ohio Admin. Code 5160-12-02.3 (eff. July 1, 2017). The Ohio Department of Developmental Disabilities is now responsible for reviewing such requests. Accordingly, any order binding ODM would have no impact on how future requests concerning Megan's PDN authorization will be handled. Plaintiff's request for injunctive relief is therefore moot.

## IV.    CONCLUSION

The Court understands Plaintiff's motives in bringing this case to federal court. Despite Plaintiff's repeated victories over ODM through the administrative appellate process, ODM has continually attempted to reduce Megan's PDN hours year after year, forcing Plaintiff to renew the fight each time. Plaintiff's frustration is not without cause. However, the state by statute has the duty to evaluate Medicaid patients annually to

determine what services are medically necessary for the state to provide. Plaintiff has not presented a case that would grant her the extraordinary relief she seeks—a permanent circumvention of this statutorily mandated process.

Accordingly, for the reasons outlined above:

1) Plaintiff's motion for summary judgment (Doc. 50) is **DENIED**;

2) Defendant's motion for summary judgment (Doc. 52) is **GRANTED**;

3) This case is **DISMISSED WITH PREJUDICE**;

4) The Clerk shall enter judgment in accordance with the above, whereupon this case is **TERMINATED** from the docket of this Court.

**IT IS SO ORDERED**.

Date: 11/20/17

Timothy S. Black
United States District Judge