UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CYNTHIA CARPENTER-BARKER, | : | Case No. 1:15-cv-41 |
| Plaintiff, | : | Judge Timothy S. Black |
| vs. | : | |
| OHIO DEPARTMENT OF MEDICAID, *et al.*, | : | |
| Defendants. | : | |

**ORDER GRANTING PLAINTIFFS' MOTION TO STAY AND FOR EMERGENCY INJUNCTION PENDING APPEAL (Doc. 67)**

This civil action is before the Court regarding Plaintiff's motion to stay and for emergency injunction pending appeal (Doc. 67), Defendant's memorandum in opposition (Doc. 74), and plaintiff's reply memorandum (Doc. 75).

## I. BACKGROUND

Plaintiff Cynthia Carpenter-Barker has sued the Ohio Department of Medicaid and its director, John McCarthy (collectively referred to as "Defendants" or "ODM") on behalf of her daughter, Megan Carpenter. Megan is a severely disabled woman in her early thirties who is unable to care for herself and whose many symptoms include intellectual disability and random seizures. Plaintiff sued to prevent ODM from reducing the 128 weekly hours of private duty nursing ("PDN") currently being provided to Megan through Ohio's Medicaid State Plan.[1]

---

[1] A more in-depth background on Megan Carpenter's disability and Plaintiff's ongoing, multi-year dispute with ODM regarding the appropriate level of PDN for Megan can be found in the Court's previous Order resolving the parties' motions for summary judgment (Doc. 65).

1

In Plaintiff's amended complaint, three claims were raised against Defendants:

1) A claim alleging that Defendants' frequent and continued proposals to reduce Megan Carpenter's PDN hours, most recently in 2014, amount to a failure to provide procedural due process in violation of 42 U.S.C. § 1396a.

2) A claim that Defendants' efforts to reduce Megan Carpenter's PDN hours violate the "integration mandate" of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132.

3) A claim that Defendants' efforts to reduce Megan Carpenter's PDN hours violate the "integration mandate" of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*

(Doc. 21, at PAGEID#: 189–94). Plaintiff's first claim was dismissed by the Court as moot on May 20, 2016. (Doc. 48, at PAGEID#: 699–701). Her final two claims were dismissed by this Court's Order granting Defendants' motion for summary judgment and denying Plaintiff's motion for summary judgment on November 20, 2017. (Doc. 65).

Plaintiff has appealed the Court's ruling on summary judgment. (Doc. 69). On December 11, 2017, Plaintiff filed the present motion to stay and for emergency injunction pending appeal. (Doc. 67). Plaintiff requests that this Court order Defendants to refrain from reducing Megan's PDN hours until the Court of Appeals for the Sixth Circuit can rule on Plaintiff's appeal. Defendants oppose the motion. To the parties' credit, a voluntary agreement was reached that has maintained Megan's previous level of PDN care while this Court evaluated this motion. (Doc. 73).[2]

---

[2] In addition to the standard briefing on the pending motion to stay and for emergency injunction, Plaintiff submitted to the Court a motion to file a supplement to her motion on February 13, 2018. (Doc. 76). The proposed supplement primarily serves to inform the Court of the Ohio Department of Developmental Disabilities' recently divulged plans regarding Megan's future PDN hours. *See* fn. 3, *infra*. This supplement is beneficial to the court, and Plaintiff's motion (Doc. 76) is granted.

2

## II.     ANALYSIS

In determining whether a stay should be granted under Federal Rule of Appellate Procedure 8(a), the Court considers the same four factors that are traditionally considered in evaluating the granting of a preliminary injunction. *See Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985); *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985). The factors to be considered are:

> (1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay.

*Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987); *see also Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (factors are the same under Fed. R. Civ. P. 62(c) and Fed. R. App. P. 8(a)). The Court will analyze each factor in turn.

### A.     **Likelihood of success on the merits**

In its Order granting Defendants' motion for summary judgment, the Court dismissed the following two claims raised in Plaintiff's Amended Complaint:

> 1) A claim that Defendants' efforts to reduce Megan Carpenter's PDN hours violate the "integration mandate" of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132.
>
> 2) A claim that Defendants' efforts to reduce Megan Carpenter's PDN hours violate the "integration mandate" of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*

(Doc. 65, at PAGEID#: 7722). The Order found that there was no evidence supporting either claim that would create a genuine dispute of material fact as to their viability, and

3

so dismissed both claims with prejudice. (*See id.* at PAGEID#: 7736).

Plaintiff's motion to stay argues that this Court's analysis of her claims was flawed and that she is likely to prevail on appeal. After reviewing the motion, this Court believes that Plaintiff's assertions are based upon several fundamental misunderstandings of the Court's analysis.

Plaintiff's first and most egregious misreading of the Court's Order is reflected in the motion's assertion that "[this Court] summarily dismissed Megan's claims because she is not part of a class action," with references to Federal Rule of Civil Procedure 23. (Doc. 67, at PAGEID#: 7742–43). No part of the Order's analysis had anything to do with class actions. Individual or small group plaintiffs can and have successfully sought relief under both the ADA and the Rehabilitation Act for discriminatory decisions made by state Medicaid administrators. *See, e.g.*, *Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013); *M.R. v. Dreyfus*, 697 F.3d 706 (9th Cir. 2012); *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599 (7th Cir. 2004); *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175 (10th Cir. 2003); *Townshead v. Quasim*, 328 F.3d 511 (9th Cir. 2003)).

However, this Court's Order noted that each of these decisions overturned a policy that was discriminatory because it imposed blanket restrictions upon a category or class of persons. Accordingly, this Court held that for Plaintiff to be entitled to relief under the ADA and Rehabilitation Act, she would need to present evidence that ODM's decisions regarding Megan's PDN hours were based not on an individualized assessment of Megan's particular situation, but upon some category or class of disability that included Megan. In other words, if there was any credible evidence that ODM had implemented a

4

policy that all people with seizures or all people who suffered from similar conditions as Megan were to be denied PDN, then Plaintiff's case could move forward. The word "class" as used in the Order in no way related to class action lawsuits or Rule 23 (which was not cited in the Order).

Plaintiff also argues that "this Court assumed, without evidence, that an analysis of Megan's unique needs was conducted." (Doc. 67, at PAGEID#: 7744). To the contrary, the Court's conclusion that a detailed, individualized analysis was conducted was supported by Defendants' reliance on a voluminous medical record to draft their dispositive motion and responsive memoranda. (*See* Doc. 65, at PAGEID#: 7729). More specifically, the record demonstrates that the following information regarding Megan's unique medical situation was used by ODM in conducting its 2014 evaluation of Megan's PDN hours that gave rise to this case:

- Daily nursing notes reflecting Megan's care from Gayle Windhorst, who served as Megan's primary nurse during PDN hours (Doc. 52-1 at 25–99, Doc. 52-2 at 1–45);

- Discussions with Gayle Windhorst and with Plaintiff concerning Megan's daily routine (*See, e.g.*, Doc. 52-4, at PAGEID#: 1214);

- Plans of care written for Megan by her treating neurologist (*see, e.g.*, Doc. 57-38);

- Megan's hospital records (Docs. 61-9; 53-14, at PAGEID#: 2769–71; 53-13, at PAGEID#: 2214–18; 53-12, at PAGEID#: 2170–74; 53-11, at PAGEID#: 1938–43; 53-10, at PAGEID#: 1776–80; 52-4, at PAGEID#: 1313–18.);

- Notes from the adult daycare center where Megan spends approximately 40 hours per week, which include records of seizures that occurred while at the center and medications administered (Docs. 57-17; 57-18).

5

Plaintiff states that this Court erred in concluding that ODM conducted an individualized assessment of Megan based on her unique medical circumstances because "the ODM and this Court never discuss what the documents [constituting Megan's medical record] actually say." (Doc. 75, at PAGEID#: 7796). Plaintiff goes on to discuss the various documents relied upon by ODM and how they either actually support Plaintiff's contention regarding Megan's PDN hours or should be discounted as flawed. This argument as to the merits of ODM's determination, like most of Plaintiff's motion to stay, belies a fundamental misunderstanding of the claims that were before this Court and this Court's role in adjudicating those claims. This Court was not charged with determining whether Megan needed 128 hours of weekly PDN. This Court was only charged with evaluating whether ODM discriminated against Megan on the basis of her disability. To that end, the Court concluded that Defendants evaluated Megan's individual condition based on a review of extensive documents pertaining only to Megan, and then made a determination related to Megan's PDN hours that would affect only her. Contrary to Plaintiff's assertion, ODM's briefing on the motions for summary judgment dives into the medical record in detail, particularly in Defendants' response to Plaintiff's motion. (Doc. 57, at PAGEID#: 3760–79). The Court found no credible evidence that ODM had any policy or institutional bias that would seek to impose a blanket upper limit on PDN hours to persons with any specific disability or type of disability.

Most of the analysis contained in Plaintiff's motion to stay is irrelevant given the claims that were at issue in the Court's Order dismissing the case. Plaintiff's motion, like her previous motion for summary judgment, discusses the competing medical opinions of

Megan's treating physician and the state physician charged with heading the evaluation into Megan's PDN. Plaintiff claims that "this Court relied heavily on the discredited, self-interested testimony of [state physician] Dr. Applegate" and "failed to defer to the treading physician, Dr. Franz." (Doc. 67, at 10 PAGEID#: 7747–48). In fact, this Court did not weigh the medical evidence provided by these two doctors at all. The Court's role, based on the amended complaint in this case, was not to make a medical determination of the amount of nursing care Megan needs per week, but rather to make a legal determination regarding whether Defendants discriminated against Megan based on a disability in violation of the ADA and the Rehabilitation Act.

Plaintiff takes issue with the Court's separation of medical and legal questions, arguing that "this Court made a tremendous error when it held the parties' arguments relating to the merits of ODM's decision regarding PDN hours had no bearing on the merits of the discrimination claim" because "if the ODM's decision had no merit, nefarious conduct is likely." (Doc. 75, at PAGEID#: 7808). Plaintiff's argument is without merit. It does not follow that because a decision was incorrect, it was discriminatory. In a case such as this where the state has decided that one Medicaid applicant does not require a certain level of service, additional evidence would need to be provided beyond evidence of a factually incorrect decision to prevail on a claim that said decision was made based on discrimination due to a disability and not due to a disagreement about the interpretation of medical information. That evidence was not provided to the Court.

7

Plaintiff is therefore not likely to prevail on the merits of her impending appeal. However, the Court does not find the appeal to be frivolous in nature. While the Court does not anticipate Plaintiff's appeal will succeed, it is conceivable that the Sixth Circuit could hold that a decision related to an individual's Medicaid benefits based solely on a personalized medical analysis that is plainly factually incorrect, despite a lack of any other evidence of discrimination, could be presumed sufficiently discriminatory to survive a motion for summary judgment. Still, given the low likelihood of Plaintiff's success on appeal, this factor weighs in favor of denying Plaintiff's motion to stay.

**B.    Irreparable Harm**

Plaintiff claims that Megan will suffer irreparable harm in the form of institutionalization, injury, or death if her PDN hours are reduced before her appeal has been resolved. There is no question that the level of medical care Megan is receiving will be drastically reduced if Defendants are permitted to drastically lower Megan's PDN hours as they seek to do.[3] In considering the propriety of preliminary injunctions, courts in many circuits have held the irreparable harm prong automatically met when the loss of medical benefits are at stake. *See Whelan v. Colgan,* 602 F .2d 1060, 1062 (2nd Cir. 1979) ("[i]n fact, the threatened termination of benefits such as medical coverage for workers and their families obviously raises the specter of irreparable injury"); *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly,* 572 F.3d 644, 658 (9th Cir. 2009) (beneficiaries of public assistance "may demonstrate a risk of irreparable injury by

---

[3] In a supplement to her motion to stay filed on February 13, 2018, Plaintiff submitted a letter from the Ohio Department of Developmental Disabilities (ODDD) stating the state's intention to completely eliminate Megan's PDN hours effective February 8, 2018 (and subject to this Court's ruling on this motion to stay). (*See* Doc. 76, at PAGEID#: 7830–31).

8

showing that enforcement of a proposed rule 'may deny them needed medical care;'") (citations omitted); *Cota v. Maxwell-Jolly,* 688 F. Supp. 2d 980, 997 (N.D. Cal. 2010) ("[T]he reduction or elimination of public medical benefits is sufficient to establish irreparable harm to those likely to be affected by the program cuts.").

Defendants' counter to this argument is that the medical evidence provided in this case demonstrates that Megan is not at risk for institutionalization, injury, or death as a result of a reduction of PDN hours. Defendants' response to the motion to stay claims both that Megan was never receiving the 128 weekly hours of PDN she had been awarded and that Megan's medical condition does not necessitate such a high weekly allotment of PDN hours. (Doc. 74, at PAGEID#: 7784–87).

However, Plaintiff has provided medical evidence in support of Megan's need for her 128 weekly hours of PDN, most notably from Megan's treating neurologist, who claims that "[allowing aides or other [non-nursing] personnel to administer medications to Megan can put her at serious risk of injury or death." (Doc. 67, at PAGEID#: 7747). As previously stated, this Court's role in evaluating Plaintiff's discrimination claims is not to weigh the parties' competing medical evidence in an attempt to determine an objective truth regarding Megan's need for PDN hours. Each side has presented credible evidence supporting their position in that debate. But on balance, given the fact that Plaintiff has presented credible medical evidence in support of her position regarding Megan's need for care, and given the precedent in federal courts for finding the risk of irreparable injury to be present when a loss of medical benefits is threatened, the Court finds that this factor weighs strongly in favor of granting Plaintiff's requested stay.

### C. Harm to Others/Public Interest

Plaintiff acknowledges that the harm to others or to the public interest in denying her proposed stay is lessened by the individual nature of Plaintiff's claim. However, Plaintiff argues that "the precedential effect of this case . . . should not be underestimated. If the ODM is permitted to discriminate against one person with disabilities and arbitrarily reduce Medicaid benefits, the ODM will likely continue to do the same [to others]." (Doc. 67, at PAGEID#: 7748). Plaintiff's argument focuses on the merits of the case, but that argument is less applicable to the merits of imposing the stay at issue here. This Court has already made its decision regarding the merits of Plaintiff's claims, and its decision on whether to impose a stay on Defendants' ability to act in accordance with the Court's ruling will not impact the precedential value of that decision.

Defendants claim that imposing the stay requested by Plaintiff will cause harm to others because requiring Defendants to continue spending state Medicaid funds on unnecessary medical care for Megan will necessarily result in diverting limited resources from other Medicaid patients. (Doc. 74, at PAGEID#: 7787–88). Defendant claims to have spent $450,000 for PDN services for Megan since 2015. (*Id.* at PAGEID#: 7787). Although it is true that at least some of any future money could presumably be spent elsewhere should the Court decline to impose a stay, the Court finds that this argument is of minimal persuasive value compared to the significant risk of harm to Megan from denying a stay. A stay imposed by this Court would last only until the pending appeal was resolved — and the money representing the difference between what the state Medicaid plan is spending now and what Defendants wish to spend is not a significant

10

cost in light of the need to ensure that this Court's ruling regarding Plaintiff's discrimination claims was the correct one.

Accordingly, the harm to others/public interest factors do not weigh significantly in favor of either granting or denying a stay.

### III. CONCLUSION

After reviewing the relevant factors for evaluating a motion to stay, the Court has found that Plaintiff has not shown likelihood of success on the merits but that the potential irreparable harm Megan Carpenter could suffer from a failure to stay weighs in her favor. (*See supra* Part II). Ordinarily, "[a]lthough no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir. 2000). Here, this Court does <u>not</u> find that "that there is simply no likelihood of success on the merits." Moreover, the stakes in this case are extraordinarily high for Megan Carpenter. Although the parties disagree as to the full extent of the care required for Megan, there is no disagreement that she is profoundly disabled and completely incapable of caring for herself. Plaintiff's credible medical evidence urges that death is a very real potential consequence of incorrectly reducing Megan's PDN hours. Given the stakes involved in this case for Megan, and the fact that Plaintiff has appealed the Court's ruling, caution is the best course of action.

Accordingly, the Court **ORDERS** the following:

1) Plaintiff's motion to supplement her motion to stay and for emergency injunction pending completion of appeal in the Circuit Court (Doc. 76) is **GRANTED**;

2) Plaintiff's motion to stay and for emergency injunction pending appeal (Doc. 67) is **GRANTED**; and

2) Defendants shall refrain from reducing Megan Carpenter's private duty nursing (PDN) hours until the Court of Appeals for the Sixth Circuit issues a final ruling on Plaintiff's pending appeal in this case.[4]

**IT IS SO ORDERED.**

Date: 2/15/18

Timothy S. Black
United States District Judge

---

[4] Defendants have previously argued to this Court that the authority to decide whether to reduce Megan Carpenter's PDN hours has recently been transferred to the (nonparty) Ohio Department of Developmental Disabilities (ODDD) via statute. (*See* Doc. 64). Plaintiffs argue that ODDD has a "sub-recipient" relationship with ODM and that ODM remains designated as the single state agency pursuant to federal law responsible for the administration of the Medicaid program in Ohio. (Doc. 67, at PAGEID#: 7745–46). This dispute does not impact the stay issued with this Order. ODDD was represented in communications with the Court regarding briefing on the motion to stay and was aware of the potential impact of the Court's impending decision. (*See* Doc. 73). Accordingly, whether ODM or ODDD makes the final decision, Megan Carpenter's PDN hours shall not be reduced until the appeal has been adjudicated.